SANDERS *v.* LEAKE & GOODLETT.

(Division B. Nov. 3, 1930.)

[130 So. 490. No. 28940.]

Paine & Paine, of Aberdeen, for appellant.

Leftwich & Tubb, of Aberdeen, for appellee.

Argued orally by **Thos. Fite Paine**, for appellant, and by **Geo. J. Leftwich**, for appellee.

**Ethridge, P. J.,** delivered the opinion of the court.

The appellees sued M. H. Sanders and J. T. Sanders, alleging that M. H. Sanders and J. T. Sanders, trading under the name and style of M. H. Sanders & Son, during the month of June, 1929, became indebted to the plaintiffs in the sum of seven hundred seventy-four dollars and forty cents for goods, wares, and merchandise sold by the plaintiffs to the defendants. The declaration averred that the materials so sold were used in the erection of a brick store, warehouse, and shed in the city of Aberdeen, describing the lot upon which the building was erected; and averring that they had a lien upon the building and lot for the purchase of said supplies and materials, and demanded judgment, etc. To the declaration was attached, as exhibits, several separate bills. The first bill attached is dated June 10, 1929, reading, "sold to M. H. Sanders and Son, Aberdeen, Mississippi," followed by the items and being for two hundred and four dollars; the second bill attached is date June 12, 1929, "sold to M. H. Sanders and Son, Aberdeen, Mississippi," followed by items amounting to two hundred and four dollars; the third is dated June 18, 1929, "sold to M. H. Sanders and Son, sixteen thousand common brick at twelve dollars, . . . one hundred ninety-two dollars;" the next bill is dated June 18, 1929, marked "sold to T. H. Sanders and Son, Aberdeen," followed by the items and being for twenty dollars and sixty cents; the next account, dated June 28, 1929, is marked "sold to J. H. Sanders and Son. Shipped to D. L. Spencer," followed by items amounting to two hundred fourteen dollars and twenty-five cents; the next is dated June 29, 1929, and marked "sold to J. H. Sanders and Son. Called for, for five thousand common brick, nine dollars and seventy-five cents. Forty-eight dollars and seventy-five cents;" and this is followed by a credit memorandum of "7—29—29. We credit. M. H. Sanders and Son," fol-

lowed by items of allowance amounting to one hundred nine dollars and twenty cents.

J. T. Sanders filed a special plea, sworn to, denying that he was a member of the partnership of M. H. Sanders & Son, and the suit thereafter proceeded against M. H. Sanders. M. H. Sanders filed an affidavit in which it is stated that she makes oath "that the account sued on in this case is incorrect, in each and every item and is not due and owing by her to the said plaintiff. That she does not owe the plaintiff a cent and did not owe plaintiff any sum prior to the filing of this suit." M. H. Sanders filed a plea of general issue and gave notice under the plea of general issue that she would offer evidence to prove that the defendant had entered into a contract with D. L. Spencer to furnish all materials except the wiring, plumbing, and steel beams and brick over the scales, and to build for her at a stated consideration the store building in Aberdeen, Mississippi, described in the plaintiff's declaration, which contract was attached to the notice of the general issue, and that the contract with Spencer by M. H. Sanders was for a lock and key job. That he was to furnish all the brick and other material necessary to build and complete said store building, except wiring, plumbing, and brick and beams for the shed over the scales. That the said contract with said Spencer, the person contracted with, contracted to purchase all material for use in the building, including the material sued on in this cause. That the said contractor did purchase said bill of goods sued on from the plaintiffs; and that the defendant never at any time gave any written or oral order to the plaintiffs for said material, never at any time assumed payment of same. That the contractor notified said plaintiffs that he had the contract and informed plaintiff of the terms of the said contract, and all materials used in the said building were sold to the said contractor and on his responsibility alone and not on that of the defendant. That the defendant had paid the entire amount of the contract to the said contractor,

Spencer, without notice of any kind from plaintiffs that Spencer was due the plaintiffs any sum, or that the amount was unpaid, and the plaintiffs looked alone to the contractor in selling said material for the contract price thereof.

It was agreed that the bill for the materials sued on was correct as to items and price, and that they went into the building. The plaintiffs testified that Spencer came to their place of business and made out an order for fifty thousand dollars brick and left the order with them, but that they did not sell to Spencer and would not sell to him because he had been foreclosed several times and was insolvent. That they called, on the phone, Mrs. M. H. Sanders & Son at Aberdeen, Mississippi, and that J. T. Sanders answered the phone, and that they stated to Sanders that they would not sell to Spencer the material desired but would be glad to ship it to M. H. Sanders & Son, and that J. T. Sanders, who was manager for M. H. Sanders in said business, told them to let it come, and that they billed the goods out to M. H. Sanders & Son, addressed to them at Aberdeen, Mississippi; the stationery had their return address thereon and the said letters never returned. That the goods were sold on the credit of M. H. Sanders & Son in pursuance of the said phone conversation, and the goods were shipped to M. H. Sanders & Son and were delivered by the railroad company. That subsequent to the shipping of the said goods, and when all of them were practically incorporated in the building, they wrote M. H. Sanders & Son a letter requesting payment and received a reply thereto denying liability, claiming that they had not purchased the same; that the goods had been purchased by Spencer. That plaintiff made a trip to Aberdeen, Mississippi, to adjust some differences as to some of the brick shipped, and that all the material, except the plate glass, had been used in the building. That they went to Spencer and told him not to put the plate glass in; they would send for it, as Sanders was trying to repudiate the contract. That

thereupon Sanders made out a check payable to Spencer and that Spencer indorsed the check over to plaintiff to pay for the plate glass, but that they distinctly notified Sanders that their acceptance of the check was in no wise prejudicial to their claim for the other material.

The testimony of the defendants, through J. T. Sanders as manager and Spencer, the contractor, was to the effect that M. H. Sanders had made no contract for the material from the plaintiffs, but had made a contract with Spencer for a lock and key job, Spencer to furnish all materials and labor.

At the conclusion of the testimony, the trial judge gave a peremptory instruction for the plaintiffs for the amount sued on, less the item for twenty dollars and sixty cents. As the court gave a peremptory instruction for the plaintiffs, the testimony of the defendants must be accepted as true together with all inference that may be legally and properly drawn therefrom. The court refused to permit the contract between Sanders and Spencer to be introduced in evidence, holding that it was a question solely as to whether there was a contract between the plaintiffs and M. H. Sanders.

J. T. Sanders then testified that he had a conversation with Mr. J. M. Thomas, Jr., of the plaintiffs, and was asked to state exactly what was said over the phone and answered:

"He called me over the telephone and wanted to know if I was J. T. Sanders and I told him I was, told me he had an order from Mr. Spencer for fifty thousand brick, said Mr. Spencer said he had a contract to build the store and wanted to know if he had the contract and I told him he did, and he said, 'That's what I wanted to know before we shipped this brick.'

"Q. Did you at any other time have any other conversation with J. M. Thomas about this contract? A. No.

"Q. Now, this Mr. Leake, the last witness who testified that he had a talk with somebody about June 18, 1929, with reference to the plate for this store building, or

some store, please state whether you ever had any conversation in June or any other time with Mr. Medford E. Leake? A. No, sir, I did not, Mr. Spencer talked about some glass, I didn't. I had a conversation about some creosoted scale timbers.

"Q. That was paid for by you? A. Yes.

"Q. And five thousand brick? A. Yes.

"Q. Besides the brick and creosoted timber, please state what other order you gave Leake & Goodlett for material to be used in the building. A. I didn't give an order for anything outside the creosoted timber and the five thousand brick to Tupelo Brick Co. and sent a check for that.

"Q. I believe under the contract you were to pay for the brick over the scale? A. Yes.

"Q. And scale timber? A. Yes.

"Q. You heard him testify he wrote a letter to J. H. Sanders & Son, Aberdeen. A. I didn't receive any such letter as this at all.

"Q. What did you have to do, if anything, with the receipt of this brick and the iron beams that went into the building for your mother? A. I didn't have anything to do with it.

"Q. Tell the jury whether or not you paid Mr. Spencer the full amount of your contract? A. I did, I paid him more than the contract. Plaintiffs object. Sustained, as it has nothing to do with this case. To which ruling of the court the defendants except.

"Q. You say Mr. Thomas came down with reference to a conversation about the color of some brick sometime after the brick were shipped down here, came to Aberdeen here and talked about off color of the brick, tell the jury whether you had any settlement with Mr. Thomas about the brick? A. Didn't have any settlement, he came and I told him I didn't have anything to settle with him, that it was between him and Mr. Spencer, he bought the brick, that I had a contract with Mr. Spencer and was responsible to him and he to Leake & Goodlett. . . .

"Q. What did he state in that telephone conversation in June, if anything, with reference to this man Spencer not being responsible or solvent, that they couldn't sell to him but would have to sell to you? A. He didn't say anything about it.

"Q. When these three cars of brick came tell the jury what you had to do in reference to payment of the brick? A. I didn't receive them, Mr. Spencer received them.

"Q. Have you examined the freight receipts exhibited? A. I saw one of them, I didn't see them all. They are not my handwriting.

"Q. Now, did you receive,' or do you recollect receiving, through the mail invoices for the brick and for the iron, material which represent the account sued on, do you know whether they were sent to you or not? A. There were invoices came to D. L. Spencer in care of M. H. Sanders & Son, I think if you will look you will find one letter that I happen to have addressed that way."

He further testified that after the goods were shipped and Spencer got them, Spencer turned the bills over to M. H. Sanders to keep in a file; that he didn't pay the freight for the bills, but that he furnished money to Spencer to pay for the materials on the occasion.

The agent of the railroad company testified and produced receipts for the shipments, some purporting to be signed by M. H. Sanders & Son, some by J. T. Sanders, but could not say who signed them, or who they were delivered to; and that the railroad company did not always require the consignee to sign for the receipts, but delivered it to people who they regarded as the agents of the consignee, or who they regarded as responsible.

D. L. Spencer testified on behalf of the defendants that he was a carpenter engaged in the contracting business around Tupelo; that he had worked for Leake & Goodlett off and on for fifteen years and had done a lot of business with them; that he went to Tupelo to purchase from Leake & Goodlett the brick to go in the building; that he first talked to Mr. Hathcock at the brick

yard and afterwards with Mr. Leake himself; that he told Mr. Leake he had a contract with Sanders for one, maybe two, stores and wanted fifty thousand or one hundred thousand brick, did not know whether he wanted it for one or two stores; that Mr. Leake said all right but did not close with him at the time, but came back and figured on the freight rates and found that he had made a price of twelve dollars delivered at Aberdeen, nine dollars at the kiln, or nine dollars and fifty cents delivered on the car. He further testified as follows:

"Q. Did you afterwards close the deal about the brick? A. All I closed about the brick was the morning I come by and ordered them wasn't anybody there but a negro, and I tore out a page of my day book and wrote an order for fifty thousand brick shipped to me here.

"Q. Whose name was signed to that? A. My name.

"Q. Did you afterwards have a talk with them? A. Yes, two or three days later I called and Mr. Leake said the brick was being loaded.

"Q. Who did you ask for when you called Tupelo? A. I don't know that I called for anyone, called 194, Leake & Goodlett's telephone number.

"Q. Do you know Mr. Leake's voice over the phone, who told you who it was when you were talking? A. I don't remember whether they said or not, said it was Leake & Goodlett.

"Q. What did you say in that conversation? (Plaintiffs object. Sustained. Exception.)

"Q. Was it some man in the office, did you get 194? A. It was a man, I can't say who it was.

"Q. After that talk did the brick come? A. Yes.

"Q. You say the brick afterwards arrived and you used them in this building? A. Yes, sir.

"Q. What did Mr. J. T. Sanders or Mrs. M. H. Sanders have to do with the purchase of those brick? (Plaintiff objects. Sustained. To which ruling defendant excepts. . . .)

"Q. After you left the order at Tupelo, which they admit they received, tell whether or not you received any communication from Leake & Goodlett at Tupelo, refusing to deliver the fifty thousand brick? A. No. . . .

"Q. Did you at any time after you left the order for fifty thousand brick in at Leake & Goodlett's, Tupelo, receive any communication either by telephone, letter or otherwise refusing to fill an order for fifty thousand brick? A. No, sir."

Spencer further testified that he had a settlement with Mr. Thomas, of the plaintiffs, on account of the color of said brick, and that J. T. Sanders did not have anything to do with it that he knew of; that Sanders had nothing to do with ordering the steel beams and angle irons, and the witness Spencer ordered them.

There is correspondence in the record between plaintiffs and defendant Sanders in reference to the transaction, in which one of the letters written on July 29th by Leake & Goodlett to Sanders says, among other things: "As you no doubt understand we made no shipments to this job without first getting your verification of the order and knowing that you would guarantee the payment of these items. It is therefore for this reason that all correspondence relative to this account is made to you direct." In answer to this letter the defendant stated: "Will state here that I had no settlement with you regarding brick. If you remember I told you the day that you were here, that you had no settlement to make with me regarding anything on this job. And further told you that was a matter between you and Mr. Spencer, as I had a contract with Mr. Spencer and was only responsible to Mr. Spencer, as per our contract and that he was responsible to you. That was our conversation."

Taking the evidence as a whole, which is, of course, too voluminous to set out in full, we think the question should have been submitted to the jury under appropriate instructions. If the goods were shipped to M. H. Sanders & Son and the bill was mailed to them showing that they

were charged with these goods, and that the goods were consigned to them instead of to Spencer, it would be their duty to have accepted them or to have notified Leake & Goodlett that they were wrongly billed to them and declined to take them out of the station. If M. H. Sanders received these bills made out and showing that they were charged to her, and that the goods were shipped to her direct, and she received them or permitted them to be received by Spencer, knowing they were charged to her, then she would be liable for them. But if the goods were in fact sold to Spencer on the original credit of Spencer, they could not by mere bookkeeping or course of dealing in shipping to Spencer change the liability from Spencer to M. H. Sanders. We think the question should have been submitted, especially in view of the fact that some of the bills were not made out to M. H. Sanders & Son; and the testimony of J. T. Sanders that he did not receive some of them at all would not make M. H. Sanders liable, although they were received by Spencer and went into the building. If J. T. Sanders received the bill and had good reason to know, or believe, that the goods were billed to M. H. Sanders, or that M. H. Sanders was the intended consignee, and if he signed for the goods at the railroad company, M. H. Sanders would be bound by such conduct to pay for the goods. In other words, M. H. Sanders under such circumstances would owe a duty to the plaintiffs to inform them that she would not be responsible, and the shipments would not be received except for the account and credit of Spencer.

The judgment of the court below will be reversed, and the cause remanded for a new trial.

Reversed and remanded.